**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHELE ANN WALTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.    17-1124 |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| NANCY A. BERRYHILL, | ) | ECF Nos. 16, 18 |
| *Acting Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

.

### I.    INTRODUCTION[1]

Michele Ann Walter ("Walter") brings this action pursuant to 42 U.S.C. §§ 405(g),

1383(c)(3), seeking review of the final determination of the Commissioner of Social Security

("Defendant" or "Acting Commissioner") denying her application for supplemental security

income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§1381-1383f.

("Act").  This matter comes before the Court on cross-motions for summary judgment.  (ECF

Nos. 16, 18).  The record was developed at the administrative level.  For the following reasons,

Walter's Motion for Summary Judgment will be denied, and Defendant's Motion for Summary

Judgment will be granted.

### II.    PROCEDURAL HISTORY

Walter filed applications for SSI benefits on September 5 and 26, 2013, claiming a

disability onset date of September 5, 2012.[2]  (R. at 24, 85, 159-73).  She claimed that her

---

[1] Pursuant to FED. R. CIV. P. 25(d) and 42 U.S.C. § 405(g), Acting Commissioner Nancy A.
Berryhill is automatically substituted as the named Defendant in place of the former
Commissioner of Social Security.
[2] Citations to ECF. No. 9, the Record, hereinafter, "R. at __."

inability to work stemmed from her depression/ anxiety DX5/2013; her learning disability; and her back and right hip issues DX 2011.  (*Id.* at 84, 160).  Walter was denied SSI benefits on January 22, 2014.  (*Id.* at 98-101).  She filed a request for an administrative hearing, which was held on November 9, 2015, before Administrative Law Judge ("ALJ") John J. Porter.  (*Id.* at 44).  Walter appeared with counsel and testified at the hearing.  (*Id.* at 44-83).  Alina Kurtanich, an impartial vocational expert, provided testimony concerning the nature of jobs and expectations of employers existing in the national economy.  (*Id.* at 78-83).

In a decision dated February 23, 2016, the ALJ determined that Walter was not "disabled" within the meaning of the Act.  (R. at 13-25).  Walter filed a request for review of the ALJ's decision by the Appeals Council, which was denied on June 29, 2017, thereby making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 1-3).

Walter filed a Motion for Leave to Proceed in Forma Pauperis on August 25, 2017, that was granted on August 29, 2017.  (ECF Nos. 1, 2).  Thereafter, Walter filed a complaint on August 29, 2017, which was not served until October 2017.  (ECF Nos. 3, 5).  After being granted an enlargement of time, Defendant filed an answer on January 22, 2018.  (ECF No. 8).  The parties voluntarily consented to having a United States Magistrate Judge conduct all further proceedings in this case.  (ECF Nos. 12, 13).  Cross motions for summary judgment followed.  The matter has been fully briefed.  (ECF Nos. 16-20).

## III.  STATEMENT OF FACTS

### A.    Walter's Background

Walter was born on November 6, 1974, and was forty-one years of age at the time of the hearing.  (R. at 52).  Walter went no further than the eighth grade.  (*Id.*)  She has no vocational or post-secondary education.  (*Id.* at 189).  Walter has three children.  (*Id.* at 285).  She initially

stopped working to take care of her middle child who at that time was just six months of age; her middle child was eleven at the time of the hearing. (*Id.* at 55). Walter's last job was as a bartender, and she previously worked as an aide at a daycare. (*Id.* at 189). Walter currently lives with her boyfriend. (*Id.* at 70).

### B. Medical Records

The ALJ's decision includes a detailed summary of the medical evidence pertaining to Walter's physical and mental impairments. (R. at 13-24). Walter's challenge pertains to the ALJ's analysis of her mental impairment.

### 1. "People in Need" Treatment Records

Dr. Michael Frantz, D.O., treated Walter at People in Need on June 12, June 30, July 21, August 21, and September 22, 2015, for mood, anxiety, and substance issues. (R. at 297-306, 317-19). She sought treatment at People in Need after being referred there by a halfway house. (*Id.* at 304). At her initial visit, Walter complained of restlessness, fatigue, anxiety, and decreased attention, memory, and concentration, but Dr. Frantz found her attention, memory, and concentration to be fair. (*Id.* at 304-05). She reported that she was seeing a therapist weekly. (*Id.*) Dr. Frantz recorded that Walter had a history of low mood, irritability, decreased sleep, and low energy. (*Id.* at 304). Avoidance, flashbacks, and hyperarousal were discussed. (*Id.* at 304). He described her affect as anxious with limited insight and judgment. (*Id.* at 305). He found her thoughts to be linear and goal directed. (R. at 305). He found her speech to be soft and slow. (*Id.*) He found her to have no evidence of hallucinations, psychosis, or suicidal/homicidal thoughts. Dr. Frantz diagnosed her with a depressive disorder and prescribed various medications. (*Id.* at 306).

On June 30 and July 21, 2015, Dr. Frantz recorded that there were mild benefits with change in medication but her symptoms continued to cause distress. (*Id.* at 300, 302). Dr. Frantz found her to be awake, alert, and oriented to person, place, time, and event; having no suicidal ideation; affect congruent; and her mood, attention, memory, and concentration to be fair. (*Id.* at 300, 302). On August 21, 2015, Dr. Frantz recorded that Walter was having less distress and tolerating her medication without side effects. (*Id.* at 298). Dr. Frantz found her to be awake, alert, and oriented to person, place, time, and event; having no suicidal ideation; affect congruent; and her mood, attention, memory, and concentration to be fair. (*Id.*) On September 22, 2015, Dr. Frantz again described Walter's symptoms as causing her less distress. (*Id.* at 317). Dr. Frantz again found her to be awake, alert, and oriented to person, place, time, and event; having no suicidal ideation; and her mood to be "better" and her attention, memory, and concentration to be fair. (*Id.* at 317).

Walter also treated with Samantha Maxwell, LCSW, at People in Need. On August 25, 2015, Walter was not taking her medication due to problems with her pharmacy and reported problems with anxiety, poor sleep, and agitation. (*Id.* at 323). Maxwell found Walter to be on edge during the session. (*Id.*) Maxwell recorded that Walter was cooperative with goal directed and productive speech. (*Id.* at 324). On September 15, 2015, Walter participated in a therapy session for anxiety and depression. (*Id.* at 320). Maxwell recorded that Walter responded positively to the fact that soon she would be leaving the halfway house and planned to attend meetings, volunteer, and engage in family counseling once she was released from the halfway house. (R. at 320). Also, on that day, Walter self-reported a reduction in PTSD symptoms with exposure to trauma-related stimuli. (*Id.*)

## 2. Dr. Wesley Sowers' Residual Functional Capacity Questionnaire

Dr. Wesley Sowers of POWER New Day Outpatient completed a mental residual functional capacity questionnaire on October 8, 2013. (*Id.* at 277). Dr. Sowers explained that he had treated Walter for four months (seeing her once per month) and found her to have both major depression and anxiety d/o NOS but could not identify when her symptoms began. (*Id.* at 277-81). Her signs and symptoms included: appetite disturbance with weight change; decreased energy; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or affect; emotional withdrawal or isolation; and emotional lability. (*Id.* at 278). Dr. Sowers did not diagnose Walter with substance dependence or identify substance dependence as one of Walter's signs or symptoms. (*Id.* at 277-78)

Dr. Sowers found Walter to be seriously limited in nearly every "Mental Abilities and Aptitudes needed to do Unskilled Work" category and recorded problems with concentration and motivation, including the ability to remember work-like procedures, carry out very short and simple instructions, maintain regular attendance, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, respond appropriately to changes in a routine work setting, get along with co-workers, deal with normal work stress, ask questions, perform at a consistent pace, and maintain socially appropriate behavior.[3] (R. at 279-80). Dr. Sowers believed Walter's impairments or treatment would cause her to miss work three days per month and that her disorders would last or had lasted at least twelve months. (*Id.* at 281). It is Dr. Sowers' medical opinion that Walter

---

[3] There were two categories he chose not to mark: "Understand and remember very short and simple instructions" and "[m]aintain attention for two hour segment". (R. at 279).

cannot engage in full-time competitive employment on a sustained basis. Finally, Dr. Sowers answered "no" to the question, "If your patient's impairments include alcohol or substance abuse, do alcohol or substance abuse contribute to any of your patient's limitations set forth above?" (*Id.*)

### 3.    POWER Outpatient Program Letter

Wilhelmenia Oakley, POWER's outpatient program manager, informed the disability claims adjuster that on May 21, 2013, Walter was diagnosed with alcohol dependence, barbiturate abuse, cocaine dependence in remission, and cannabis dependence in remission. (*Id.* at 282). She began treatment on May 30, 2013. On June 18, 2013, she completed orientation and was moved to Intensive Outpatient Level Care where she was required to attend eight hours of group and one hour of individual therapy per week. On July 16, 2013, due to a relapse, she was moved into "Partial Level of Care" and was required to attend sixteen hours of group and two individual sessions per week. Walter stepped down to "Intensive Level of Care" on October 2, 2013. (*Id.*)

### 4.    Dr. Charles Kennedy

On January 9, 2014, Walter underwent a consultative psychological evaluation with Dr. Charles Kennedy. (R. at 284-91). Dr. Kennedy recorded that Walter regained custody of two of her children in December 2013. (R. at 285). Dr. Charles Kennedy recorded that Walter self-reported depression, that she had difficulties with motivation, and that she spent four hours each day feeling tearful, self-isolating, and lying in her bed. (*Id.* at 286). Walter also self-reported experiences with anxiety with panic attacks that occurred most frequently with crowds and a period of alcohol abuse from February 2013 to May 2013. (*Id.*) Dr. Kennedy noted that she was tearful throughout the evaluation and had difficulty with serial 7's and spelling the word

"world" backwards. (*Id.* at 287). Dr. Kennedy's exam revealed that Walter's speech was normal, her stream of thought was goal-directed, she was fully oriented, did not have hallucinations or delusions, and that her memory, concentration, judgment, and insight were intact. (*Id.* at 284-91). Dr. Kennedy diagnosed her with a major depressive disorder, recurrent mild-to-moderate; panic disorder with agoraphobia; and alcohol abuse in early full remission. (*Id.* at 289). Dr. Kennedy noted her progress was fair and she should reconsider counseling and continue sobriety. (*Id.* at 290).

Dr. Kennedy also completed a Medical Source Statement of Ability to do Work-Related Activities on January 9, 2014. (R. at 292-95). Dr. Kennedy found Walter to be mildly impaired with regard to understanding, remembering, and carrying out simple instructions. (*Id.* at 292). Dr. Kennedy found her moderately impaired with regard to understanding, remembering, and carrying out complex instructions. (*Id.*) He found that she would be moderately impaired in interacting appropriately with the public, supervisors, and co-workers and in responding appropriately to usual work situations and to changes in routine or work setting. (*Id.*) Finally, he noted that "[s]obriety should improve [her] prognosis". (*Id.* at 293).

### C.     Administrative Hearing

At the hearing before the ALJ on November 9, 2015, the following discussion took place between the ALJ and Evan Wolfson, Walter's counsel:

ALJ: . . . We have no treatment records from Dr. Sowers.

ATTY: Right. Which happens with him, on occasion, Your Honor. But I - -

ALJ: Did you try to get them?

ATTY: Yes, we did. Yes, we did. And we actually didn't get any records, other than that RFC. So I understand what your position may be there, and I can appreciate that. I did see that there was the treatment plan summary that was

received in 3-F.  I can certainly make another attempt to try to get a summary, if Your Honor would like.

ALJ: But we need his medical records.  Without them, I can't give weight to his statement.  The regulations are such that I have to evaluate his statement in light of his treatment notes.  If he doesn't - - and we've had this problem with Dr. Sowers before.

ATTY: Yes. . . . Normally, the issue is with the Neighborhood Living Project.  This is a different facility that he goes to.

ALJ: Right.  But you need to be more proactive in getting those records or letting me know what needs to be done to get them. . .

(R. at 49-50).  The ALJ then gave Walter thirty days to obtain the treatment notes from Dr.

Sowers and explained that if

I don't see those records, I'll look to see if you asked for more time.  If you asked for more time, I'll give you another 30 days.  If someone won't cooperate, I'll do what I can to compel them - - subpoena or whatever I - - subpoena's what I can possibly do.  But [if] I don't see those records and I don't see any request for time, I'll assume those things don't exist, or they're not helpful, and may decide the case without them.

(*Id.* at 51).

Walter testified at the hearing that her debilitating anxiety and hip pain prohibited her

from maintaining full-time work as an afterhours janitor.  (R. 55-56).  Walter recounted getting

panic attacks when left alone and would experience them a couple of times per day or maybe two

to three times per week.  (R. at 56-57).  Her panic attacks could last all day.  (*Id.* at 57).  She later

testified that they occurred four to five times per week and would last a half-hour.  (*Id.* at 58).

She explained that she was prevented from performing an afterhours cleaning job because of her

hip pain and the fact that her mind would race.  (*Id.* at 58-61).  Walter testified that she had been

sober from alcohol, marijuana, and non-prescribed controlled substances for nine months.  (*Id.* at

62).  She explained that in September 2013, she was taking suboxones and Vicodin and using

alcohol.  (*Id.* at 62-65).  She testified that at that time she was using drugs and alcohol regularly

and heavily. (*Id.* at 68). She acknowledged that she had been trapped in addiction until her present period of sobriety. (*Id.* at 69). Nevertheless, Walter testified that her mental health had not improved since becoming sober. (*Id.* at 65). In terms of day-to-day activities, Walter testified that her boyfriend did all of the cooking, cleaning, grocery shopping, keeping track of money, and paying bills. (*Id.* at 71).

Following Walter's testimony, the ALJ asked the vocational expert whether a hypothetical person of Walter's educational level, training, and work background would be eligible for a significant number of jobs in existence in the national economy if she were limited to light exertional level work; needed the option to sit or stand, to change positions at a maximum frequency of every thirty minutes, and was limited to occasional postural maneuvers with no crouching, crawling, or climbing; was limited to simple routine and repetitive tasks that were not fast-paced and was limited to simple working decisions; required only incidental collaboration with co-workers and the public; and was able to collaborate with a supervisor thirty minutes per day. (*Id.* at 79). The vocational expert responded that such a person would be capable to work as marker, with 260,000 positions available in the national economy; a sorter, with over 280,000 positions available in the national economy; and an electronic worker, with over 350,000 positions available in the national economy. (R. at 79-80).

The ALJ also asked the vocational expert a second hypothetical: would a person who has a marked impairment in the ability to maintain concentration and pace such that she would be off task seventy percent of the workday, who cannot sustain light duty type work for more than an hour per workday, and who would need to be off task two to three times per week for an hour each time, be eligible for a significant number of jobs in existence in the national economy. (*Id.* at 80). The vocational expert responded that there would be no jobs for that individual. (*Id.*)

### D. Post-Administrative Hearing Correspondence

On December 9, 2015, Walter's attorney requested that the ALJ hold the record open for

an additional two weeks so that her medical records from Allegheny Valley Hospital/ Alle Kiski

Medical Center and POWER New Day Outpatient could be obtained. (*Id.*at 243). The ALJ

wrote on December 17, 2015, that

> I held the record open subsequent to the hearing for the above-referenced claimant
> so that you could submit additional evidence. You neither submitted such
> evidence nor sent a request for more time.
>
> If you do not send the evidence, request additional time, or satisfactorily explain
> why you cannot submit the requested evidence, within 10 days of the date of this
> letter, I will make my decision based on the available evidence.

(*Id.* at 244). On December 23, 2015, Walter's Counsel responded,

> I am writing in response to your letter of December 17, 2015. Please be advised
> that my office has submitted records from several providers since the hearing, and
> the only set of records that we are still trying to obtain are the records from Power/
> New Day. On behalf of my client, I respectfully request an additional two weeks
> to secure these records. My assistant has left several messages at that facility,
> without a response to date.
>
> The contact information for the facility is below, if Your Honor would like to
> subpoena these records in the meantime. . . .

(R. at 245).

There is no further correspondence in the record.

### E. ALJ's Opinion

The ALJ began his opinion by noting "that the record was complete with the submission

of Exhibit 3F (Exhibit 13E)" and that

> [w]hile Dr. Sower's[sic] records were mentioned at the hearing, counsel did not
> request additional time to obtain them nor did he request that the undersigned
> attempt to compel their production. Given he only treated the claimant for two
> months during the relevant period, I deem them unnecessary. Experience has
> shown that it is difficult, if not impossible to obtain Dr. Sower's[sic] treatment
> notes. Notably, the record contains treatment notes generated by Dr. Frantz, which

> describe the claimant's treatment history. Dr. Kennedy, a consultative examiner, also gave information on claimant's mental status. These records are sufficient to assess claimant's mental residual functional capacity.

(*Id.* at 13). After consideration of the record medical evidence, Walter's testimony, and the testimony of the vocational expert, the ALJ determined that Walter was not disabled within the meaning of the Act.

The ALJ determined that Walter had not engaged in any substantial gainful activity since she filed her application. (*Id.* at 15). The ALJ found the following severe impairments: bursitis of the right hip, depression, anxiety, and drug and alcohol abuse in reported remission. (*Id.*) The ALJ found that Walter did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16). Specifically, he found that she does not have objective findings of the necessary severity to meet or medically equal Listing 1.00 (musculoskeletal system), 12.04 (affective disorders), 12.06 (anxiety related disorders) and/or 12.09 (substance abuse). Based on Walter's impairments, the ALJ determined Walter has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b). (*Id.* at 18). The ALJ determined that Walter did not have any past relevant work. (*Id.* at 23). However, in light of Walter's age, education, work experience, and residual functional capacity, the ALJ determined Walter could perform jobs existing in significant numbers in the national economy including a marker, sorter, or electronics worker. (*Id.* at 23-24).

## IV.    STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. § 404.1520.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, the claimant is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205-06 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. § 405(g)[4]; *Hagans v. Comm'r of Soc. Sec.*,

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the Commissioner . . . made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. . . .

42 U.S.C. § 405(g).

694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F. 3d 113, 118 (3d Cir. 2002).

"Substantial evidence is defined as 'more than a mere scintilla;' it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Trauterman v. Colvin*, 1 F. Supp. 3d 432, 435 (W.D. Pa. 2014); *see S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery Corp.*, 332 U.S. at 196-97. Further,

> even where this court acting *de novo* might have reached a different conclusion . . . . so long as an agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings of fact.

*Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1191 (3d. Cir. 1986) (internal citation and quotation omitted); *see also Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (explaining that

where substantial evidence supports a decision, the court will not overturn it, even if in disagreement).

## V.  DISCUSSION[5]

### A.  Duty to Develop the Record

Walter argues that, in failing to obtain her treatment records from Dr. Sowers, the ALJ failed to properly develop the record resulting in a finding that was not supported by substantial evidence. "[T]he adequacy of an ALJ's investigation is determined on a 'case-by-case basis.'" *Rosa v. Colvin*, 956 F. Supp. 2d 617, 623 (E.D. Pa. 2013).[6] Where there is a suggestion of a mental impairment, the ALJ has a duty to develop the record by "inquiring into the present status of [the] impairment and its possible effects on the claimant's ability to work", which can be satisfied by soliciting testimony from the claimant. *Plummer*, 186 F.3d at 434. Although the ALJ has an obligation to develop a full and fair record, the ultimate burden of proving disability remains with the plaintiff. *Rosa*, 956 F. Supp. 2d at 621-22 (clarifying that the "duty is heightened when the claimant appears at the hearing without the benefit of counsel"). The plaintiff has the burden "because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004). Thus, "[w]hile an ALJ is required to assist the claimant in developing a full record, he or she has no such obligation to 'make a case' for every claimant." *Durden v. Colvin*, 191 F. Supp. 3d 429, 449 (M.D. Pa. 2016) (internal citation and quotation omitted). "Only if the evidence before the

---

[5] The relevant period is the date of the protective filing through the date of the ALJ's decision. *See Pounds v. Astrue*, 772 F. Supp. 2d 713, 720 (W.D. Pa. 2011).

[6] Some factors courts can consider when determining whether there is a heightened duty are the plaintiff's *pro se* status, "awareness of the records' existence; the ALJ's statements that he would hold off on writing an opinion until obtaining the records; the fact that the records suggested a mental impairment"; and the fact that the records come from a treating psychologist. *Rosa v. Colvin*, 956 F. Supp. 2d 617, 623-24 (E.D. Pa. 2013).

Commissioner is *insufficient* does the ALJ have the duty to attempt to obtain additional evidence to determine whether a claimant is disabled." *Money*, 91 F. App'x at 210 (citing 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3)) (emphasis added).

For a case to be remanded for failure to develop the record, the party must allege that the missing evidence resulted in prejudice to the plaintiff. *Durden*, 191 F. Supp. 3d at 450; *Herring v. Colvin*, 181 F. Supp. 3d 258, 271-72 (M.D. Pa. 2014). In an analogues case, *Colavito v. Apfel,* the United States District Court for the Eastern District of Pennsylvania found that the ALJ had not violated its regulatory obligation to develop the record when it failed to obtain the treatment notes of a physician who had given a conclusory medical opinion that was contrary to the other medical evidence because the ALJ had left the record open, the plaintiff was represented, and there was sufficient medical evidence in the record to refute the opinion. 75 F. Supp. 2d 385, 399 n.21 (E.D. Pa. 1999).

Despite being represented at all stages in the litigation, Walter has yet to proffer the missing treatment records or state what might be in them that would contradict the record medical evidence. *Durden*, 191 F. Supp. 3d at 451 (explaining "[t]he [c]ourt cannot engage in meaningful judicial review of [p]laintiff's claim that the ALJ erred in failing to obtain documentation if the [c]ourt cannot review the allegedly wrongfully omitted documentation"). As a result, this Court is left to speculate that the treatment records are material and the failure to include them was prejudicial. That is an inferential leap that this Court is unwilling to make.[7]

---

[7] Although not mentioned by the ALJ, it should be noted that written at the top of Dr. Sowers' medical source statement is "Attach relevant treatment notes and test results as appropriate." (R. at 277). There were no treatment notes or test results attached to Dr. Sowers' medical source statement.

Furthermore, there was sufficient medical evidence already of record to determine disability, particularly Dr. Frantz's treatment notes and the consultative examination, both of which contradicted Dr. Sowers' medical opinion. "While '[t]reating physicians' reports should be accorded great weight,' they are entitled to controlling weight only where their conclusions are well supported by medical evidence of record, and are not inconsistent with other substantial evidence." *Clinkscales o/b/o T.S. v. Colvin*, 232 F. Supp. 3d 725, 733 (E.D. Pa. 2017) (quoting *Plummer*, 186 F.3d at 429) (alteration in original).[8] If the treating physician's opinion conflicts with the opining physicians' own notes or other portions of the medical record, the ALJ may appropriately use those bases in declining to give controlling or great weight to the opinion. *Ridenbaugh v. Barnhart*, 57 F. App'x 101, 105 (3d Cir. 2003). "In evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another. . . ." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009).

In his decision, the ALJ afforded little weight to the assessment of Dr. Sowers who had only treated Walter for four months (two during the relevant period). (R. at 22). The ALJ afforded little weight to Dr. Sowers' opinion finding it inconsistent with the medical record. The ALJ stressed that contrary to Dr. Sowers' opinion, while receiving treatment at People in Need with Dr. Frantz and during a consultative examination with Dr. Kennedy, Walter consistently presented as being alert, oriented, appropriate and cooperative, with clear, coherent, goal directed relevant speech, with no evidence of suicidal ideation, delusion or paranoia and intact memory,

---

[8] Check the box or fill in the blank forms regardless if completed by a treating physician, are not entitled to controlling weight, are weak evidence at best, and when not accompanied by a thorough written report are considered suspect. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" and the reliability of such reports not accompanied by a thorough written report is considered suspect) (citing *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986); *Green v. Schweiker*, 749 F.2d 1066, 1071, n.3 (3d Cir. 1984)).

concentration, and attention. (*Id.* at 22). The ALJ found that Dr. Frantz only recorded that Walter *appeared* anxious. The ALJ noted Dr. Sowers' assertion that Walter was "unmotivated" and emphasized that Dr. Sowers appeared to have ignored Walter's substance abuse history entirely. (R. at 22).

The ALJ's findings are supported by the record. The treatment records at People in Need reveal that Walter appeared awake, alert, oriented, no suicidal/homicidal ideation, affect congruent, no hallucinations or psychosis, with linear and goal directed thoughts, soft/slow speech, and had good memory, concentration, and attention. (R. at 297-306, 317-19). Although the ALJ relied predominantly on the treatment records of Dr. Frantz, he also relied on the consultative examination of Dr. Kennedy. Dr. Kennedy's exam reveals that Walter's speech was normal and her stream of thought was goal-directed; she was fully oriented; she did not have hallucinations or delusions; and her memory, concentration, judgment, and insight were all intact. (*Id.* at 284-91).

An ALJ is entitled to give more weight to an opinion that is more consistent with the record as a whole, which is exactly what ALJ Porter did in this case. *See* 20 C.F.R. § 404.1527. The fact that the ALJ evaluated Dr. Sowers' opinion in light of the other record medical evidence was not an error or was his decision to give Dr. Frantz's opinion and Dr. Kennedy's consultative report greater weight. Therefore, this case is unlike the case cited by Walter, *Welsh v. Colvin*, Civ. Act. No. 13-736, 2014 WL 2214221, at *2 (W.D. Pa. May 28, 2014), because ALJ Porter did not make findings based on what was not in the record but rather based on what was in the record. Thus, substantial evidence exists in the record to support the ALJ's findings of fact.

### B. Purported Factual Inaccuracies in the ALJ's Decision

Walter contends that the ALJ's decision is not supported by substantial evidence because there are a number of factual inaccuracies in the ALJ's opinion. Walter is incorrect on each count. Walter first stresses that the ALJ's factual summary that Walter's counsel "did not request additional time to obtain [Dr. Sowers' treatment records] nor did he request that the undersigned attempt to compel their production" was inaccurate. (ECF No. 17 at 13). Walter's portrayal of the facts is erroneous for two reasons. Contrary to Walter's assertion, when the ALJ issued his February 23, 2016 decision, there was not a request for additional time pending before the court. In fact, Walter's last request for a two-week extension occurred on December 23, 2015. (R. at 245). Additionally, Walter's implication that she requested a subpoena is misplaced. After informing the ALJ that she was still trying to obtain Dr. Sowers' treatment records, Walter wrote the following "request" for a subpoena: "The contact information for the facility is below, if Your Honor would like to subpoena these records in the meantime." (R. at 245); *compare Cassidy v. Colvin*, Civ. Act. No. 15-711, 2016 WL 1086354, at *3 (W.D. Pa. Mar. 21, 2016) (finding that the ALJ's decision was not based on substantial evidence where the ALJ had specifically said that she would subpoena the medical records and failed to do so), *with Forberger v. Astrue*, Civ. Act. No. 10-376, 2011 WL 1085684, at *15 (W.D. Pa. Mar. 21, 2011) (explaining "[h]aving left the decision to seek these additional records within the sole discretion of the ALJ, [p]laintiff cannot argue that she was denied due process when the ALJ did not subsequently issue a subpoena"). Even Walter concedes that she never made a formal request. (ECF No. 17 at 13-14). Furthermore, the ALJ warned Walter's counsel at the hearing that if there was not a request for an extension of time or for a subpoena, he would "assume those [records] don't exist, or they're not helpful, and may decide the case without them." (R. at 51).

Second, Walter argues that the ALJ was incorrect when he wrote that Dr. Sowers treated Walter for only two months and not for four months. (ECF No. 17 at 14). However, the ALJ actually wrote that the *relevant* period was only two months, which is correct. The relevant period began with the filing of the application in September 2013. Dr. Sower's reported on October 8, 2013, that he had treated Walter for four months; thus, at most, two months of Walter's treatment history with Dr. Sowers falls within the relevant period. (R. at 277-81). Moreover, it is unclear how this characterization, even if it had been erroneous, would have been prejudicial as any argument that there was prejudice because Dr. Sowers likely would have reviewed the POWER treatment records is speculative at best.

Third, Walter challenges the accuracy of the ALJ's finding that Dr. Sowers did not know about Walter's drug history because the facility where he was practicing medicine was actually a facility for substance abuse. (ECF No. 17 at 16-17). Walter mischaracterizes the ALJ's decision; the ALJ wrote, "Neither his diagnosis nor assessment acknowledge a very substantial drug and alcohol issue that was active while he treated her. This omission, undermines the accuracy of his report." (R. at 22). There is substantial evidence to support the ALJ's determination that Dr. Sowers' opinion did not account for Walter's history of drug use or the fact that she was seeking treatment at a drug and alcohol treatment center as Dr. Sowers never acknowledges her drug and alcohol history.[9] Dr. Sowers did not diagnose her with substance abuse, list substance abuse among her diagnoses or impairments, and answered "no" to the question, "If your patient's impairments include alcohol or substance abuse, do alcohol or substance abuse contribute to any of your patient's limitations set forth above?" (R. at 277-81).

---

[9] Walter also argues that there are no records to demonstrate that Walter "was in the deep throws of addiction" in 2013. (ECF No. 17 at 17). However, it was Walter who testified that she had been trapped in addiction until her present period of sobriety. (R. at 69).

Fourth, Walter argues that the ALJ erred in determining that Dr. Sowers' records were not needed, based upon Dr. Frantz's treatment records, because the ALJ mischaracterized and misunderstood Dr. Frantz's treatment records. Specially, Walter alleges that the ALJ inaccurately observed that Dr. Frantz's treatment records "suggest claimant does not exhibit mental or psychiatric symptoms during periods of abstinence." (ECF No. 17 at 15). Rather, Walter asserts that Dr. Frantz's records confirm she had depression, experienced distress from it, and was on significant psychotropic medication. (*Id.* at 15-16). However, the ALJ's decision does consider Walter's depression, her symptoms, and her medication. The ALJ acknowledged that "[o]nce the claimant began to attend therapy and medication management visits with Dr. Franz, she reported her mood was improved, she reported no active medical problems and mental status examinations were consistently unremarkable." (R. at 21). Additionally, the ALJ summarized Dr. Frantz's notes that the claimant appeared anxious, suffered from depression, and was in early full remission from alcohol dependence. (*Id.*) Therefore, the ALJ considered Walter's depression, symptoms, and medication.

Fifth, Walter asserts that the ALJ improperly found that Dr. Sowers' records were "difficult if not impossible" to obtain. Walter has not explained how this misstatement would change the analysis as to whether the record's exclusion was prejudicial. Finally, Walter supposed that the ALJ erroneously disregarded Dr. Sowers' clinical finding that Walter was "unmotivated"; however, the ALJ properly did so in light of the other treatment records. (ECF No. 17 at 14, 16).

## C. Other Purported Mischaracterizations by the ALJ

Walter contends that the ALJ's decision is not supported by substantial evidence because he improperly gave significance to certain facts. According to Walter, the ALJ failed to explain

how the completion of one ten-hour parenting class in July 2015, demonstrates that Walter had a greater functional capacity than alleged. (ECF 17 at 18-19). By splicing out one sentence in a multipage discussion, Walter fails to accurately describe the ALJ's treatment of Walter's parenting class. Earlier on the same page of the opinion, the ALJ summarizes Walter's testimony regarding her symptoms and disabilities, their persistence, and their limiting effects not only on her ability to work but also on her quality of life. (R. at 19). Specifically, the ALJ explains,

> When asked if she could be a janitor in an office building, performing simple tasks such as cleaning, wiping desks and empting wastebaskets after people had gone home, with a supervisor checking on her, she stated she could not. . . . Additionally, the claimant stated that she experiences panic attacks, characterized by paranoia, fear and chest tightness, when she is alone. I[n] fact, the claimant stated her attacks could occur daily, weekly or monthly and last as long as a day, noting she cannot even wash her own windows without experiencing an attack.

(*Id.*) The ALJ then proceeded to view her symptoms and disabilities in light of Walter's medical records before turning to the ten-hour class. (*Id.*) After the purportedly improper comment, the ALJ explains that the provider of the course determined that Walter "should not seek employment while in this program related to substance abuse." (*Id.*) Thus, the implication is that the provider believed Walter had the ability to return to work but for her drug dependence. In summation, the ALJ considered the completion of the class and the provider's opinion in light of Walter's testimony as to her functional capacity and in light of the rest of the medical evidence and, thus, was only one of many factors in analyzing her claim.

Walter next takes issue with the ALJ for faulting Walter for not participating in a "significant, sustained course of professional mental health treatment." (ECF No. 17 at 18). To be clear, the ALJ was explaining that it was "difficult to find that [Walter's] ability to perform ordinary activities of daily living is impaired secondary to mental health symptoms" because her

history of mental health treatment and her struggles with panic attacks are not well-documented. (R. at 16-17). Nevertheless, the ALJ reading "the evidence in a light most favorable to the claimant" found that "panic attacks could impair her social functioning and/or concentration and attention." (*Id.* at 17). Thus, the ALJ did not fault Walter for her lack of mental health treatment.

Finally, Walter not only asserts that the ALJ misunderstood the facts surrounding her custody, or lack thereof, of her younger children in December 2013, but also challenges the relevance of the ALJ discussing the children's custody in the first instance. (ECF No. 17 at 18-19). According to Walter, the ALJ incorrectly asserted that because Walter's children had been returned to her for a period in January 2014 that this suggested "she had improved." (*Id.*) Walter states that this is factually inaccurate, citing Dr. Larkin's records which provide that custody resided with her father. (*Id.*) However, Dr. Charles Kennedy, whose opinion the ALJ was discussing, did, in fact, write that Walter reported that, "[t]hey[, her children, were] returned to her custody in December 2013." (*Id.* at 285). Thus, it appears at the very least that the record conflicts as to this evidence and the ALJ is entitled to resolve conflicts in the record. *Orndorff v. Colvin*, 215 F. Supp. 3d 391, 407 (M.D. Pa. 2016). While drawing a negative inference based on Plaintiff having custody of her children is improper, as set forth above there is still substantial evidence to support the Commissioner's findings of fact. *See Gleason v. Colvin*, 152 F. Supp. 3d 364, 380-81 (M.D. Pa. 2015).

## VI.   CONCLUSION

For the foregoing reasons, Walter's motion for summary judgment (ECF No. 16) will be

denied, the Acting Commissioner's motion for summary judgment (ECF No. 18) will be granted,

and final judgment will be entered in favor of the Acting Commissioner and against Walter.

An appropriate order follows.


Dated:  July 19, 2018                          BY THE COURT:

                                               _____
                                               LISA PUPO LENIHAN
                                               United States Magistrate Judge


cc:     All Counsel of Record
        *Via Electronic Mail*